# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

JAMES GONSALVES; JOHN GONSALVES;
DADA, LLC; and SOUTH BEND
REAL ESTATE HOLDINGS, LLC;

   Plaintiffs;

  v.

TIM CLEVELAND and KAYLA DAWSON;

   Defendants.

Civil Action No. 3:10-CV-348-JVB

## OPINION & ORDER

By January 11, 2010, Blue Jeans Bar & Grill, a Mishawaka, Indiana, establishment owned by James Gonsalves through DADA, LLC, had come under false suspicion of serving alcohol to Shawn Devine, whose drunk driving killed a policeman and his canine partner two days earlier. Acting on the misinformation of a local law-enforcement agency that Devine had visited Blue Jeans before the fatal crash, Lieutenant Tim Cleveland of the Indiana Excise Police ordered his subordinate, Officer Kayla Dawson, to seize Blue Jeans' digital-video recorder ("DVR"). It seems they expected the video would reveal Blue Jeans selling alcohol to Devine after it became apparent that he was drunk. Dawson and Cleveland also mistakenly believed that Blue Jeans' licensure and regulation by the state's Alcohol and Tobacco Commission ("ATC") had involved a waiver of the Fourth Amendment right to freedom from unreasonable seizures.

Dawson promptly seized the DVR as ordered, along with other personal property that might have proved Devine had been at Blue Jeans. Neither Defendant spoke of seeking a warrant before the seizure, or for as long as it lasted.

Once the Excise Police had the evidence, their investigation stalled, even as Gonsalves repeatedly asked after the status of his case and the expected return date for his seized property. Dawson can't recall for sure whether she got around to watching any of the video that January. Confirmed is that she did not view the recording in its entirety until March 31, 2010.

Dawson then told Cleveland the video was unclear and that she could not identify Devine on it. That April 5, Cleveland told WSBT, a television station interviewing him for the story, that the police had video proof that Devine had visited Blue Jeans before the fatal crash. The officers kept the DVR until June 25, 2010, having allowed James Gonsalves to see it for the first time just a few days before.

On August 23, 2010, Plaintiffs brought this civil-rights lawsuit for the foregoing incidents, along with other allegations that are actionable only if Dawson and Cleveland's conduct was racially motivated. The partial grant of Defendants' motion for judgment on the pleadings the following year narrowed the case to Counts I, II, IV, and VI of the Complaint. (DE 31.) In what remains of Count I, DADA and James Gonsalves seek to recover through 42 U.S.C. § 1983 for "Defendants' wrongful seizure and retention of the video recorder, and other actions . . . , including the false statements," which they claim violated their rights under the Fourth and Fourteenth[1] Amendments to the United States Constitution. (Compl., DE 1, at 6.) Count II, asserted by all Plaintiffs, also under § 1983, calls for redress of Defendants' actions as "racially motivated, or otherwise in bad faith and oppressive, such that Plaintiffs' equal protection rights under the Fourteenth Amendment . . . were violated." (*Id.* at 7.) In Count IV, as it now stands, DADA and

---

[1] The brief supporting the motion for partial summary judgment relies on the Fourteenth Amendment only insofar as it was interpreted by *Mapp v. Ohio*, 367 U.S. 643 (1961), to make the Fourth Amendment applicable to the states. (*See* DE 66 at 9–15.)

South Bend Real Estate Holdings, LLC, ("SBREH") claim Defendants' actions were intended to, and did, "discourage and prevent other persons from doing business with the Plaintiffs," and that Defendants "deprived Plaintiffs of their right to make contracts on the same basis as is enjoyed by white persons." (*Id.* at 8.) It is 42 U.S.C. § 1981 that DADA and SBREH invoke in seeking to recover for that alleged wrongdoing. (*Id.*) As the briefing recognizes, Counts II and IV both require evidence that Defendants were motivated by race. Count VI requests an injunction, but does not allege any separate basis for relief.

Before the Court are cross-motions under Rule 56 of the Federal Rules of Civil Procedure. James Gonsalves and DADA seek a partial summary judgment of Defendants' liability on Count I. Defendants, in turn, are asking for wholesale summary judgment. There are few disputed facts, and where there are competing reasonable inferences to be drawn from the evidence, the discrepant possibilities prove inconsequential to the proper disposition of the motions.

The prolongation of Defendants' seizure of the DVR violated James Gonsalves and DADA's Fourth Amendment rights as a matter of law and beyond the bounds of qualified immunity. The rest of Plaintiffs' case fails, however, because they lack any evidence of racial animus.

## A. EVIDENCE AND FACTS

Driving drunk, Shawn Devine killed Mishawaka Police Corporal James Szuba and his police dog on January 9, 2010.

Captain Gregory Deitchley of the Indiana Excise Police soon received a phone call from Dean Chandler, who was a member of Saint Joseph County Police Department's Fatal Alcohol Crash Team ("FACT"). The conversation was "brief." Chandler said he "had information that Devine . . . had been at Blue Jeans" before the crash. (Deitchley Dep. 20:13–18, DE 54-4 at 3.) Chandler did not say what the source of his "information" was, and there is no indication that Deitchley asked. (*Id.* at 20:23–24.)

Deitchley relayed Chandler's message to Cleveland, and asked Cleveland to investigate whether Devine had been at Blue Jeans. (*Id.* at 21:19–22:2.) "[A]t some point," Deitchley and Cleveland "determined that the best way to confirm whether Devine was in there [was to] seize [Blue Jeans'] video recording system." (*Id.* at 22:20–24.) Deitchley directed Cleveland to carry out that plan. (Cleveland Dep. 19:20–20:1, DE 67-3 at 5–6.)

Cleveland then called Dawson and instructed her to seize the DVR. Cleveland and Dawson's undisputed testimony is that doing so was in accordance with their department's standard operating procedures. (Cleveland Dep. 16:9–18:12; Dawson Dep. 16:3–17, DE 68-3 at 3.) Both believed it was permitted by Indiana law. (*Id.*) The subject of seeking a warrant was not discussed.

On January 11, 2010, Dawson and another officer went to Blue Jeans and seized receipts, the DVR system, and employee schedules. The officers then took the DVR system to an evidence room. James Gonsalves made multiple inquiries of Dawson regarding the status of the case and when he could expect to have his property returned. Even months later, however, Defendants continued to "refus[e] to release" the DVR system. (Ans., DE 8, at ¶ 16.) It was not until June 25, 2010, that they did so. (*Id.* ¶ 17.)

Now in the summary-judgment setting, Defendants have asserted that they lacked the unilateral authority to return the DVR system. (Mem. Supp. Defs.' Mot. Summ. J., DE 64, at 3.)

Dawson saw the recording from Blue Jeans at most three times. (Dawson Dep. 32:14–19.) She struggles to recall when and how much she watched on each occasion. (Dawson Dep. 30:24–34:19.) No one viewed the entire recording until March 31, 2010. (Br. Supp. Mot. Partial Summ. J., DE 66-1, at 4 (undisputed by Defendants).)

For his part, Cleveland never watched it. (Cleveland Dep. 41:18.) But on April 5, 2010, he gave an interview to WSBT in which he stated that the police had video showing Devine at Blue Jeans before the fatal car accident. He expounded: "We can prove he was there and how long he was there and we're going to definitely be taking a look at that." (Cleveland Dep. 34:1–14; DE 68-6 at 3.) "There's a sense of urgency," he said, "absolutely, before somebody else gets killed." (Cleveland Dep. 34:10–14; DE 68-6 at 3.) Cleveland's interview statements surprised Dawson, she says, because they were inconsistent with what she had told him about the video. (Dawson Dep. 36:3–5.) In particular, her deposition testimony indicates that she told him before April 5 that the recording was unclear and that she was unsure whether Devine had been at Blue Jeans. (Dawson Dep. 33:22–34:8, 34:24–36:5) Cleveland's testimony, on the other hand, suggests he had not received a report from Dawson regarding the video's content by April 5, and he affirmatively testifies that Deitchley told him Devine was at Blue Jeans. (Cleveland Dep. 31:3–22, 32:1–3, 33:15–22.)

Dawson emailed on April 15, 2010, that she had just finished watching the video from Blue Jeans "again" and stated that there was "no clear video of Devine [there] before the accident." (Pls.' Ex. 17, DE 41-4 at 25.)

The local Excise Board held a hearing on June 23, 2010, regarding the renewal of Blue Jeans' license. Neither Defendant had decision-making power on that Board. The DVR system had not been returned yet, but Plaintiffs had the opportunity to review the video in advance of the hearing and to inform the Board that it did not show Devine. Dawson reported to the Board that "due to the poor quality of the surveillance system and the low image, [she could] not say that Shawn Devine was or was not at the business." (Ans. ¶ 15.) The same day, Cleveland told WSBT that officers were certain that with Devine's cooperation, they could prove Devine had been at Blue Jeans on the date of the crash. (*Id.*) Devine had in fact told Dawson in May that he had never been to Blue Jeans. (Pls.' Facts, DE 71-10, at ¶ 19 (uncontested by Defs.).)

The Board ultimately decided to recommend that the ATC not renew Blue Jeans' license. The Board explained that its recommendation did not depend on the allegation that Devine had been at Blue Jeans. The ATC adopted the Board's recommendation. DADA did not seek administrative or judicial review of the nonrenewal decision but rather entered into an agreement with the ATC to transfer its license to another entity.

Defendants and Plaintiffs had some history of tension even before the above-described events. Notably, Cleveland refused to shake John Gonsalves's hand when they first met in 2003. John Gonsalves claims Cleveland participated in handcuffing him the next year while customers and employees were present. In 2006, when James Gonsalves

bought Blue Jeans, Cleveland protested the transfer of the liquor license. Cleveland had said that Blue Jeans "catered to criminals."

Plaintiffs also submit evidence they contend shows that police "targeted" and "shut down" Blue Jeans despite receiving more calls about white-owned bars in the area that were not shut down. The details of this prove irrelevant, however, because the evidence does not indicate whether either Defendant was involved in law enforcement's alleged treatment of white-owned bars.

## B. LAW AND ANALYSIS

### 1. Summary-Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (covering motions for partial summary judgment also). Substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A motion under Rule 56 of the Federal Rules of Civil Procedure is not an occasion for the court to "weigh" the evidence. *Id.* at 249. Nonmoving parties receive the benefit of having the evidence viewed in the light most favorable to them, *Payne v. Pauley*, 337 F.3d 767, 769 (7th Cir. 2003), but a factual issue is "genuine" only if it could be reasonably resolved in their favor. *See, e.g.*, *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011).

### 2. Count I

In general, plaintiffs may sue under 42 U.S.C. § 1983 for deprivations of their Fourth Amendment rights committed by "any person" acting under color of law. But unless

police officers have violated "'clearly established statutory or constitutional rights,'" they enjoy qualified immunity from any suit for civil damages for their official conduct. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In analyzing qualified immunity, courts may assess first the occurrence of a statutory or constitutional violation, and then whether the right involved was clearly established, as was mandated by *Saucier v. Katz*, 533 U.S. 194 (2001). *Pearson*, 555 U.S. at 236. Alternatively, they may "exercise their sound discretion in deciding" to begin with the question of whether the right was "clearly established." *Id.*

The Fourth Amendment protects "the right of the people to be secure in their . . . houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. There is no question here that Defendants seized personal property from Blue Jeans on January 11, 2010, and that the seizure of the DVR system lasted until late that June. Seizing personal property without a warrant is generally unreasonable. *United States v. Burgard*, 675 F.3d 1029, 1032 (7th Cir. 2012) (citing *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)). But police may seize personal property without a warrant temporarily, so long as they have "'probable cause to believe that a container holds contraband or evidence of a crime' and 'the exigencies of the circumstances demand [doing so] or some other recognized exception to the warrant requirement is present.'" *Id.* (citing *United States v. Place*, 462 U.S. 696, 701 (1983)).

### (a) January 11, 2010, Seizure

The Court agrees with Defendants that undisputed facts establish their qualified-immunity defense to liability for any Fourth Amendment violation that occurred in the January 11 seizure of personal property from Blue Jeans.

The Court so concludes with the dictum of warning to law enforcement, however, that a Fourth Amendment violation may have occurred from the instant this seizure began. Thus, a motion to suppress the evidentiary fruit of the initial seizure might have been well taken on these or similar facts in a criminal prosecution against Blue Jeans or its staff. After all, exigencies such as readily-destructible evidence in the hands of a suspect can justify temporary warrantless seizures more extensive than those governed by *Terry* principles[2] only where supported by probable cause. *See Burgard*, 675 F.3d at 1032 (citing *McArthur*, 531 U.S. at 330; *Place*, 462 U.S. at 701). This seizure exceeded the *Terry* realm, and Defendants apparently lacked probable cause, because while the tip from Dean Chandler matters greatly for qualified-immunity purposes, it lacked the detail necessary for probable cause.

When the clock is ticking, to be sure, police cannot be asked to cross-examine other officers for the foundation of the information they receive. *See United States v. Hensley*, 469 U.S. 221, 231 (1985) (citing *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976)). The officer who effects a seizure under exigent circumstances therefore need not personally know enough substantiating facts to establish probable cause, but such facts would then at least have to be within the collective knowledge of the officer's agency. *Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The same collective-knowledge defense might also protect a superior officer who orders an exigent seizure on the basis of information received from other

---

[2] [W]hen an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.

*United States v. Place*, 462 U.S. 696, 706 (1983).

members of law enforcement. But Cleveland and Dawson have no evidence that anyone within the Indiana Excise Police or FACT knew what the ostensible probable cause to believe Devine had visited Blue Jeans was. For all our record shows, Chandler's "information" was no better than an unsubstantiated anonymous tip. The absence of evidence of collective knowledge of probable cause suggests the seizure was a Fourth Amendment violation from the outset.

Nevertheless, qualified immunity shields police officers who "'could have believed'" their actions were permissible "'in light of clearly established law and the information the . . . officers possessed.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Id.* (citing *Creighton*, 483 U.S. at 641). Cleveland and Dawson were reasonable for relying on the representations of other law-enforcement officers because the circumstances were exigent. Indeed, Blue Jeans still controlled the DVR and receipts. So far as Defendants knew, Blue Jeans' personnel readily could have destroyed any incriminating data if officers failed to intervene with haste. *See United States v. Talkington*, 843 F.2d 1041, 1044 (7th Cir. 1988) (explaining exigency is present "where the nature of the evidence is evanescent and the agents fear its imminent destruction").

### (b) Prolonged Retention of Seized Property and False Statements

Defendants' prolonged retention of the seized property requires separate consideration. Indeed, "a seizure reasonable at its inception . . . may become unreasonable as a result of its duration." *Segura v. United States*, 468 U.S. 796, 812 (1984). The Supreme Court has emphasized the importance of promptly following up on

a warrantless seizure with reasonable efforts to obtain a warrant. *See, e.g.*, *McArthur*, 531 U.S. at 332–33.

And this mandate was well enough established by the time of Dawson's and Cleveland's actions that any ignorance of it was unreasonable. For example, *United States v. Place*, 462 U.S. 696, 709 (1983), declaring unconstitutional the warrantless ninety-minute seizure of a suitcase on the basis of mere reasonable suspicion, was published over a quarter-century before the events at issue here. *Illinois v. McArthur*, 531 U.S. 326, 332–33 (2001), re-emphasizing the importance of promptly obtaining a warrant, issued about nine years before this seizure began.

Cleveland and Dawson defend their warrantless retention of the seized property with what could roughly be categorized as four arguments.

First, they cite an Indiana statute empowering the ATC "to seize alcohol, alcoholic beverages, malt articles, or any other personal property when the seizure is lawful under the provisions of . . . title [7.1 of the Indiana Code]."[3] Ind. Code § 7.1-2-3-12(b). The Court has previously addressed this argument by drawing upon Indiana Code § 7.1-2-5-6 in support of reading "any other personal property" to mean only alcohol or tobacco products and their receptacles or containers. (DE 31 at 5); *see also CSX Transp., Inc. v. Ala. Dep't of Rev.*, 131 S. Ct. 1101, 1113 (2011) ("[T]he canon of *ejusdem generis* . . . 'limits general terms [that] follow specific ones to matters similar to those specified . . . .'" (alteration in original) (quoting *Gooch v. United States*, 297 U.S. 124, 128 (1936))); Antonin Scalia & Bryan A. Garner, *Reading Law* 199–213 (West 2012) (detailing and approving the *ejusdem generis* canon with numerous comparable

---

[3] Defendants also refer to Indiana Code § 7.1-3-1-6, covering "the entrance, inspection, and search" of an enforcement officer, but because they did far more than enter, inspect, and search, that law needs no further discussion.

interpretations). Insofar as Defendants suggest Indiana Code § 7.1-2-3-12(b) trumps the Fourth Amendment, they are likely incorrect. Indeed, state law does not "alter the content" of Fourth Amendment limitations on seizures (or searches). *Virginia v. Moore*, 553 U.S. 164, 172 (2008) (citing *Whren v. United States*, 517 U.S. 806 (1996) (seizures); *California v. Greenwood*, 486 U.S. 35 (1988) (searches)).

In a similar vein, Defendants also rely on the premise that taverns have a reduced expectation of privacy. They explain that "as a part of being a regulated entity under Indiana law and in exchange for the economic privilege of being able to serve alcoholic beverages, Blue Jeans is subject to searches and seizures of its property." (*See* Mem. Supp. Defs.' Mot. Summ. J., DE 64, at 8.) It is true that the owners or operators of commercial premises in closely-regulated industries generally do have a reduced expectation *of privacy. See New York v. Burger*, 482 U.S. 691, 702 (1987). Seizures, however, don't implicate privacy; they invade possessory interests in property. *See Burgard*, 675 F.3d at 1033 (citing *Segura*, 468 U.S. at 806). In any event, Defendants have not earnestly attempted to fit their actions within a "special needs" framework, so pursuing that line of cases here would be inappropriate. Defendants also haven't shown evidence that Blue Jeans in particular consented to the seizure at issue. Indeed, the following exchange during Lieutenant Cleveland's deposition suggests the opposite:

> Q. In regards to seizing evidence from a tavern, a license holder here in the state, in your perspective what's required to do that?

> A. To seize evidence of any nature inside of a premises?

> Q. Yes, sir.

> A. Basically you don't need a warrant because they've signed the affidavit saying that they give up their right to search and seizure upon receiving their permit.

.  .  .

Q. I'm handing you what's been marked as Exhibit 18, sir. Is that the permit language that you're talking about, is it on that form?

A. Yes.

Q. And where is it, sir?

A. Box No. 2.

Q. I don't see the word "seizure" in that box, sir, do you see the word "seizure"?

A. I do not.

Q. Do you think you were mistaken a moment ago . . . ?

A. Well, that's been what we do.

(Cleveland Dep. 16:20–17:19.) For these reasons, the Court rejects this first of Defendants' arguments.

Second, Defendants claim now that they lacked the authority to release the seized items unilaterally, and so, they argue, they cannot be responsible for the prolongation of the seizure. This is a non-starter. Cleveland and Dawson's answer admits that *they* refused to return the items to Plaintiffs. (Ans. ¶ 16 (admitting that, months after the initial seizure, *Defendants* continued to "refus[e] to release" the DVR system); ¶ 17 (admitting *Defendants* were the ones who ultimately did release it).) "A judicial admission," such as an admission in an answer to a complaint, "trumps evidence." *Murrey v. United States*, 73 F.3d 1448, 1455 (7th Cir. 1996) (citing *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 333 (7th Cir.1993)).

Third, Lieutenant Cleveland contends he had too little involvement in the seizure to be liable for it. As he points out, even gross negligence is not enough for a supervisor to

be liable for a subordinate's constitutional tort. *Jones v. City of Chi.*, 856 F.2d 985, 992 (7th Cir. 1988). "The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Id.* at 992–93. Cleveland believes his actions do not meet this standard, because he and Dawson never discussed a warrant and he did not personally participate in the carrying out of the seizure. He compares himself to Chief Wodack in *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 866–67 (7th Cir. 2004), who was not "involved in obtaining or executing" an allegedly bogus search warrant. But Cleveland knew it was his department's ordinary practice to seize from licensees without a warrant. (Cleveland Dep. 17:19.) His analogy fails because he personally ordered the seizure at issue and recklessly mischaracterized the evidence it yielded, expecting that a mass-media outlet would publicize his statements. Because of that, any reasonable jury would find that he knew of Dawson's seizure and condoned it, which satisfies the standard he has supplied for supervisory responsibility.

Finally, both Defendants also claim qualified immunity for the warrantless retention of the seized evidence. They say they acted "pursuant to the accepted standards and practices of the Indiana Excise Police." (Mem. Supp. Defs.' Mot. Summ. J. 11.) The evidence cited in support of that proposition consists of Dawson's, Cleveland's, and Deitchley's deposition testimony. (*Id.* at 13.)

Dawson testified that her Indiana Excise Police training was that "when a person applies for and receives an alcohol permit, they no longer have a search and seizure right under the [Fourth] Amendment or in the location of that business and . . . items at that

location are subject to seizure at any time without a warrant." (Dawson Dep. 16:3–17.) Likewise, the Indiana Excise Police's standard operating procedures incorporated this belief. (*Id.* at 16:14–17.) The cited testimony by Cleveland is quoted and reproduced above. It expresses an understanding of the Excise Police's training and procedures that substantially parallels Dawson's testimony on those subjects. The Deitchley testimony is that at some time after the events of this case, policies and procedures for searches and seizures in licensed premises changed, such that the Excise Police would no longer seize video and recording equipment without a warrant. (Deitchley Dep. 14:3–15:8.)

Defendants have thus shown that at the relevant time, it was standard practice of the Excise Police to seize personal property from ATC-licensed premises without a warrant or probable cause. Yet this does not necessarily mean it was also Excise Police's standard practice to take months to investigate probable cause for a warrantless seizure, once initiated. For that reason, when it comes to analyzing what happened after January 11, it is unclear that Defendants' evidence satisfies the sufficient condition of their cited proposition that "police officers are entitled to qualified immunity when they rely on standard operating procedures." (Mem. Supp. Defs.' Mot. Summ. J. 13.)

Another problem with Defendants' argument here is that they are deriving their rule from a Fourth Circuit Court of Appeals case from 1985. The Supreme Court has explained things differently since then, by stating that "a policy, of course, could not make reasonable a belief that was contrary to a decided body of case law." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). Thus, accepting the proposition that all of Defendants' actions were pursuant to policy wouldn't necessarily mean they are entitled to immunity.

It would remain to see what the decided case law had to say about those policy-backed actions.

Of course, a bald prohibition against objectively-unreasonable seizures will not supply the fair warning to officers that is required to defeat qualified immunity. *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam) (quoting Saucier, 533 U.S. at 201–02). *Brosseau* and *Saucier*, however, should not be misread to hold that qualified immunity shields all official conduct whose constitutionality is subject to a balancing test. Sometimes balancing can be one-sided, after all. "[I]f plaintiffs had to point to a case on all fours with their own, defendants would nearly always be entitled to qualified immunity." *Coady v. Steil*, 187 F.3d 727, 734 (7th Cir. 1999). The real question is simply whether a reasonable state actor would have known that the defendant's actions, viewed in light of the law at the time and the circumstances confronting the defendant, were unlawful. *Brosseau*, 543 U.S. at 199; *see also Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 732 (7th Cir. 2013) ("[J]ust as defining a right too broadly may defeat the purpose of qualified immunity, defining a right too narrowly may defeat the purpose of § 1983." (citing *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012))); *Coady*, 187 F.3d at 734 (quoting *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir.1996)).

Therefore, the circumstance that this case is not factually "on all fours" with a controlling precedent is not dispositive. As demonstrated below, qualified immunity does not protect Dawson and Cleveland for the months-long prolongation of the seizure, because no reasonable officer could have believed it was lawful under these undisputed facts and the contemporaneous state of the law.

Though *Burgard* was decided after the return of Plaintiffs' property, it provides an extremely useful distillation of the relevant considerations, derived from pre-2010 Supreme Court precedents and common sense. 675 F.3d at 1033–35. *Burgard* explains "courts must assess the reasonableness of a seizure by weighing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* at 1033 (quoting *Place*, 462 U.S. at 703).

On the Fourth Amendment claimant's side of the scales, the focus is on "any possessory interest in the seized object, not . . . privacy or liberty interests." *Id.* (citing *Segura*, 468 U.S. at 806). The Seventh Circuit Court of Appeals understandably called it "obvious" that delays in seeking a warrant infringe the possessory interest more severely, the longer they last. *Id. Burgard* also pointed out that holdups in pursuing a warrant "undermine the criminal justice system in a more general way" by preventing prompt judicial evaluation, thus forestalling the correction of improper seizures. *Id.* Another factor bearing on the extent of the infringement upon a possessory interest is whether the dispossessed individual checks on the status of the seizure or seeks assurance that the item will be returned. *Id.*

These concerns are to be weighed against the strength of law enforcement's basis for the seizure. *Id.* "All else being equal, the Fourth Amendment will tolerate greater delays after probable-cause seizures." *Id.* (deriving this rule primarily from *Place*, 462 U.S. at 709, and *McArthur*, 531 U.S. at 331). Courts also consider how diligent the police were in investigating. *Id.* "When police neglect to seek a warrant without any good explanation for that delay, it appears that the state is indifferent to searching the item and the intrusion

on an individual's possessory interest is less likely to be justifiable." *Id.* (citing *United States v. Mitchell*, 565 F.3d 1347, 1351 (11th Cir. 2009) (deeming a twenty-one-day delay in applying for a warrant unreasonable where the only reason given for the delay was that the agent "didn't see any urgency")).

None of these considerations suggests Defendants' seizure was reasonable. Gonsalves and DADA had an obviously-legitimate interest in possessing their DVR and business records, and in comparison with previous, known unconstitutional seizures, *e.g.*, *Place*, 462 U.S. at 709, five months was an especially long deprivation. Cleveland and Dawson didn't just fail to seek a warrant promptly, though; they failed to exercise anything remotely approaching reasonable diligence in trying to establish probable cause, which they should have quickly discovered was absent. This failure is probably attributable to their reliance on a document that they unjustifiably believed effected a waiver of the right to freedom from unreasonable seizures. (*See* Cleveland Dep. 16:20–17:19.)

Once Dawson did finally complete her review of the evidence, months after she'd seized it, she advised Cleveland that the video didn't show what they had been looking for. Suffice it to say that by then, the officers knew there was no colorable claim of even reasonable suspicion to support the seizure. Still they refused to release the DVR, for seventy-one more days. Cleveland recklessly misinformed the public through a mass-media outlet that the video showed Devine, which implied that Blue Jeans was in part responsible for Corporal Szuba's untimely death. Though Cleveland told the media, "[t]here's a sense of urgency, absolutely, before somebody else gets killed," (Cleveland Dep. 34:10–14) he evidently never felt that urgency to even the minimal degree it would have taken to investigate what he was talking about. Either that, or it was a malicious lie.

For her part, Dawson took no remedial action of which the Court has evidence, despite awareness that her supervisor was making false defamatory[4] statements to WSBT. Defendants' lengthy withholding of the wrongfully-seized evidence is all the more unreasonable for interfering with Plaintiffs' ability to rebut Cleveland's false public accusations. Especially in light of James Gonsalves's repeated inquiries after his property and the status of his case, therefore, Dawson and Cleveland's doings and omissions far exceeded the limits of the law. Qualified immunity does not apply to Count I as pertaining to the warrantless retention of the items seized from Blue Jeans for five months without probable cause. Defendants are liable for this misconduct as a matter of law.

### 3. Counts II and IV

Plaintiffs acknowledge that each of Counts II and IV requires proving intentional racial discrimination. (Resp. Opp. Defs.' Mot. Summ. J. 11, 13.)

They have no such evidence. Plaintiffs' police records, which they say show that white-owned bars near Blue Jeans generated more calls while only Blue Jeans was targeted by police and shut-down, tell us nothing, in and of themselves, about *Cleveland or Dawson*'s motivation. Plaintiffs offered no evidence that either Defendant was involved in handling any of the calls about the comparator bars. As *Coleman v. Donahoe*, 667 F.3d 835, 848 (7th Cir. 2012) (involving alleged discrimination in violation of Title VII of the Civil Rights Act of 1964) made clear, comparators can help prove a particular

---

[4] Deciding whether Cleveland committed the tort of defamation under Indiana law is unnecessary, and the Court is not doing so. The element of a defamatory statement, however, does appear to be satisfied. *See Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 451 (Ind. 1999) ("A defamatory communication is defined as one that tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." (Citations and quotation marks omitted.)).

decisionmaker's alleged discriminatory intent only if *that decisionmaker* was also involved in the ostensible comparator cases. Otherwise, the comparators are not truly similarly situated in the relevant sense.

Plaintiffs have also attempted to rely on Dawson and Cleveland's interactions with Plaintiffs, but none of those events could reasonably be interpreted to have had racial undertones. The best of this evidence is Defendants' handling of the property they seized from Blue Jeans. Plaintiffs also cite, for example, an occasion in 2003 when Cleveland refused to shake John Gonsalves's hand, saying "I don't shake hands just with anybody." In addition, the Court assumes for purposes of summary judgment that Cleveland and other officers handcuffed John Gonsalves in front of customers and employees in 2004, and that Cleveland assaulted one of Plaintiffs' employees. Cleveland protested the transfer of a liquor license when James Gonsalves bought Blue Jeans, as well, and said the bar catered to criminals. Viewed in the light most favorable to Plaintiffs, this still has no apparent connection to race. No reasonable jury could find in Plaintiffs' favor on Counts II and IV.

## C.  CONCLUSION

The Court **GRANTS** James Gonsalves and DADA's motion for partial summary judgment (DE 65) insofar as the Court rules as a matter of law that Defendants are liable to them for unreasonably prolonging the warrantless seizure of personal property from Blue Jeans. The motion is **DENIED** to the extent it sought a ruling that Defendants were liable for the seizure as soon as it occurred.

Defendants' motion for summary judgment (DE 63) is **GRANTED** with respect to Counts II and IV, but **DENIED** as to Count I.

**SO ORDERED** on September 30, 2013.

_s/ Joseph S. Van Bokkelen_
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE